## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| TIFANI DIAMOND, on behalf of herself and all others similarly situated,<br><br>     Plaintiff,<br><br> v.<br><br>SUREFIRE MANAGEMENT, LLC; SUREFIRE MANAGEMENT GROUP, L.P.; SUREFIRE HOSPITALITY GROUP, L.P.; SUREFIRE RESTAURANTS, LLC; SUREFIRE RESTAURANTS - CRANBERRY, LLC; SUREFIRE RESTAURANTS - MCCANDLESS, LLC; SUREFIRE RESTAURANTS - NORTH SHORE, LLC; SUREFIRE RESTAURANTS - WATERFRONT, LLC; SUREFIRE RESTAURANTS GROUP - BLUE SPRUCE, L.P.; SUREFIRE RESTAURANTS GROUP - CRANBERRY, L.P.; SUREFIRE RESTAURANTS GROUP - MCCANDLESS, L.P.; SUREFIRE RESTAURANTS GROUP - NORTH SHORE, L.P.; SUREFIRE RESTAURANTS GROUP - WATERFRONT, L.P.; SUREFIRE RESTAURANTS-BLUE SPRUCE, LLC; B-LUX RESTAURANTS, INC.; HERKY POLLOCK; MICHAEL HANLEY; GERALD DILEMBO; VIC BOVALINO and DOE DEFENDANTS 1-10,<br><br>     Defendants. | Civil Action No.: 2:25-cv-00190<br><br>**CLASS AND COLLECTIVE ACTION COMPLAINT**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

Plaintiff Tifani Diamond ("Diamond" or "Plaintiff"), on behalf of herself and all others similarly situated, alleges as follows:

## <u>INTRODUCTION</u>

1. This is a class and collective action brought on behalf of "Tipped Employees" (defined herein) who work or have worked at the Restaurants (defined herein) operating under the

trade name Burgatory that are or were owned, operated, and/or managed by Defendants Surefire Management, LLC; Surefire Management Group, L.P.; Surefire Hospitality Group, L.P.; Surefire Restaurants - McCandless, LLC ("McCandless LLC"); Surefire Restaurants - North Shore, LLC ("North Shore LLC"); Surefire Restaurants - Waterfront, LLC ("Waterfront LLC"); Surefire Restaurants Group - Blue Spruce, L.P. ("Blue Spruce LP"); Surefire Restaurants Group - Cranberry, L.P. ("Cranberry LP"); Surefire Restaurants Group - McCandless, L.P. ("McCandless LP"); Surefire Restaurants Group - North Shore, L.P. ("North Shore LP"); Surefire Restaurants Group - Waterfront, L.P. ("Waterfront LP"); Surefire Restaurants-Blue Spruce, LLC ("Blue Spruce LLC"); and B-Lux Restaurants, Inc. ("B-Lux") (collectively the "Burgatory Entities" and/or the "Company"); and Mike Hanley ("Hanley"), Herky Pollock ("Pollock"), Gerald Dilembo ("Dilembo"), and Vic Bovalino ("Bovalino") (collectively the "Individual Defendants" and together with the "Company", the "Defendants"), and have been subject to the unlawful practices detailed herein.

2.      The Burgatory Entities function as a single integrated enterprise—a casual restaurant that serves, *inter alia*, burgers and shakes known as "Burgatory."

3.      Upon information and belief, Defendants own and operate approximately seven restaurant locations in the Commonwealth of Pennsylvania. At these locations, Defendants employ "Tipped Employees" (defined below).

4.      Defendants maintain a single website that incorporates each of the restaurant locations.

5.      On their website, Defendants identify and/or refer to these locations as a single entity. Specifically, the website contains language that states, *inter alia*,: (i) "Burgatory is a friendly little joint that makes some of the best burgers and shakes you've ever had;" and (ii)

"Enjoy your stay in Burgatory." *See* https://burgatorybar.com/ (last visited February 7, 2025).

6.      Per the Defendants' website, Defendants operate restaurant locations at the following addresses: (i) Fox Chapel/Waterworks (located at 932 Freeport Road, Pittsburgh); (ii) North Fayette/The Pointe (located at 300 McHolme Drive, Pittsburgh); (iii) Homestead/Waterfront (located at 299 West Bridge Street, West Homestead); (iv) Murrysville/Blue Spruce (located at 100 Blue Spruce Way, Murrysville); (v) North Shore (located at 342 North Shore Drive, Pittsburgh); (vi) McCandless Crossing (located at 700 Providence Blvd, McCandless); and (vii) Cranberry Twp. (located at 2080 Mackenzie Way #600, Cranberry Twp.). *See* https://burgatorybar.com/ (last visited February 7, 2025). These locations are referred to herein as the "Restaurants."[1]

7.      As detailed below, Defendants effectively function as a single integrated enterprise in operating the Restaurants.

8.      Each of the Burgatory Restaurants has the same menu and largely maintains the same hours of operation.

9.      "Burgatory" maintains a single Instagram and LinkedIn account.

10.      As detailed below, upon information and belief, each of the Burgatory Entities at issue maintain common ownership, have interrelated operations, and share the same employment policies, including those relating to the compensation of Tipped Employees.

11.      As such, upon information and belief, the employment practices complained of

---

[1] In addition, Defendants operate locations at (i) PPG Paints Arena, which is only open during Penguins games and certain special events, and (ii) Heinz Field, which is only open during Steelers games and certain special events. Upon information and belief, Defendants do not employ Tipped Employees at these two locations. Should discovery reveal that Tipped Employees are employed at these locations, Plaintiff will seek leave to include these locations in the definition of Restaurants.

herein were applicable to all Tipped Employees, as Defendants utilized common labor policies and practices. Accordingly, Defendants are responsible for the employment and compensation practices at issue.

12. Defendants employ individuals as "servers" ("waiters" and "waitresses") and bartenders (collectively, "Tipped Employees"), who are and/or were subjected to Defendants' unlawful pay practices.

13. As explained in detail below, Defendants systematically and willfully deprived Plaintiff and Tipped Employees of minimum wages in violation of the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.*, ("FLSA") and the Pennsylvania Minimum Wage Act ("PMWA"), 43 P.S. § 333.101, *et seq.*, and the Pennsylvania Wage Payment Collection Law ("WPCL"), 43 P.S. § 260.1, *et seq.*, by, among other things, failing to satisfy the notice requirements of the tip credit provisions of the FLSA and PMWA.

14. Due to Defendants' unlawful failure to properly inform Tipped Employees of its intention to utilize a "tip credit", Defendants have improperly applied a "tip credit" against the wages paid to Plaintiff and current and former Tipped Employees, thus paying them less than the mandated minimum wage.

15. In addition, Defendants also violated applicable wage laws by enforcing a policy or practice of paying Tipped Employees only the tip-credit cash wage when (i) those employees were required to perform non-tipped work that was *unrelated* to their tipped occupation and/or (ii) those employee spent in excess of 20% of their time performing non-tipped work that was *related* to their tipped occupation.

16. Further, Defendants also violated applicable wage laws by enforcing a policy or practice of paying Tipped Employees only the tip-credit cash wage when those employees (i) were

required to perform set-up work before the Restaurant was open to the public and/or (ii) were required to perform break-down work after the Restaurant was closed to the public.

17.    Additionally, Defendants violated applicable wage laws by utilizing an improper tip pool whereby managers participated in a tip pool when filling in as bartenders while still being compensated as a manager.

18.    As a result of the aforementioned pay practices, Plaintiff and the members of the Classes (defined below) were illegally under-compensated for their work.

19.    Finally, Defendants failed to keep accurate records of the tips earned by Tipped Employees, effectively requiring Tipped Employees to claim tips for tax reporting purposes that they had otherwise provided to other employees, per Defendants' mandatory tip pooling policy, while not requiring those employees to report their tips for tax purposes.

## SUMMARY OF CLAIMS

20.    Plaintiff brings this action as a collective action to recover unpaid wages, pursuant to the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. § 201 *et seq*. ("FLSA" or the "Act").

21.    In particular, Plaintiff brings this suit on behalf of the following similarly situated persons:

> All current and former Tipped Employees who have worked for Defendants in the United States within the statutory period covered by this Complaint and elect to opt-in to this action pursuant to the FLSA, 29 U.S.C. § 216(b) (the "Collective Class").

22.    In addition, Plaintiff also brings this action as a state-wide class action to recover unpaid wages, and failing to pay the applicable minimum wage, pursuant to the PMWA and the WPCL (collectively, the "PA State Laws").

23.    Specifically, Plaintiff brings this suit on behalf of a class of similarly situated

persons composed of:

> All current and former Tipped Employees who have worked for Defendants in the Commonwealth of Pennsylvania during the statutory period covered by this Complaint (the "PA Class").

24.    The Collective Class and PA Class are hereafter collectively referred to as the "Classes."

25.    Plaintiff alleges on behalf of the Collective Class that they are: (i) entitled to unpaid minimum wages from Defendants for hours worked for which Defendants failed to comply with the notice provisions of the tip credit and pay the mandatory minimum wage, as required by law; (ii) entitled to unpaid minimum wages from Defendants for hours worked performing unrelated duties to their direct customer service duties; (iii) entitled to unpaid minimum wages from Defendants for hours worked where they spent in excess of 20% of their time performing non-tipped work that was *related* to their tipped occupation; and (iv) entitled to liquidated damages pursuant to the FLSA, 29 U.S.C. § 201 *et seq.*

26.    Plaintiff alleges on behalf of the PA Class that Defendants violated the PA State Laws by failing to comply with the tip credit provisions, as required by law, and consequently failing to pay them the appropriate minimum wages for all hours worked. In addition, Defendants also violated the PMWA by failing to pay the PA Class members the full minimum wage for time spent performing non-tip generating work and/or paid them a tipped-cash wage when there was no chance for them to earn tips due to the Restaurant being closed to the public.

## PARTIES

27.    Plaintiff Tifani Diamond is a resident of the Commonwealth of Pennsylvania who was employed by Defendants as a "server" in the Commonwealth of Pennsylvania. While employed as a Tipped Employee, Defendant failed to compensate Plaintiff properly for all hours worked.

28.     Pursuant to Section 216(b) of the FLSA, Plaintiff has consented in writing to be a plaintiff in this action. Her executed Consent To Sue form is attached hereto as Exhibit A.

29.     Defendant Surefire Management, LLC is a limited liability company registered to do business in the Commonwealth of Pennsylvania with its registered address at 932 Freeport Rd, Pittsburgh, PA. Upon information and belief, Surefire Management, LLC is used by Defendants as a conduit to manage and/or operate a "Burgatory" Restaurant at a given location. At all relevant times during the statutory period covered by this Complaint, Defendant Surefire Management, LLC has transacted business within the Commonwealth of Pennsylvania, including within this district.

30.     Defendant Surefire Management, L.P. is a limited partnership registered to do business in the Commonwealth of Pennsylvania with its registered address at 932 Freeport Rd, Pittsburgh, PA. Upon information and belief, Surefire Management, L.P. is used by Defendants as a conduit to manage and/or operate a "Burgatory" Restaurant at a given location. At all relevant times during the statutory period covered by this Complaint, Defendant Surefire Management, L.P. has transacted business within the Commonwealth of Pennsylvania, including within this district.

31.     Defendant Surefire Hospitality Group, L.P. is a limited partnership registered to do business in the Commonwealth of Pennsylvania with its registered address at 932 Freeport Rd, Pittsburgh, PA. Upon information and belief, Surefire Hospitality Group, L.P. is used by Defendants as a conduit to manage and/or operate a "Burgatory" Restaurant at a given location. Surefire Hospitality Group, L.P. is listed as the licensee on the liquor license for the Burgatory Restaurant located at 300 McHolme Drive. At all relevant times during the statutory period covered by this Complaint, Defendant Surefire Hospitality Group, L.P. has transacted business within the Commonwealth of Pennsylvania, including within this district.

32.     Defendant Surefire Restaurants - McCandless, LLC ("McCandless LLC") is a limited liability company registered to do business in the Commonwealth of Pennsylvania with its registered address at 932 Freeport Rd, Pittsburgh, PA. Upon information and belief, McCandless LLC is used by Defendants as a conduit to manage and/or operate a "Burgatory" Restaurant at a given location. At all relevant times during the statutory period covered by this Complaint, Defendant McCandless LLC has transacted business within the Commonwealth of Pennsylvania, including within this district.

33.     Defendant Surefire Restaurants - North Shore, LLC ("North Shore LLC") is a limited liability company registered to do business in the Commonwealth of Pennsylvania with its registered address at 932 Freeport Rd, Pittsburgh, PA. Upon information and belief, North Shore LLC is used by Defendants as a conduit to manage and/or operate a "Burgatory" Restaurant at a given location. At all relevant times during the statutory period covered by this Complaint, Defendant North Shore LLC has transacted business within the Commonwealth of Pennsylvania, including within this district.

34.     Defendant Surefire Restaurants - Waterfront, LLC ("Waterfront LLC") is a limited liability company registered to do business in the Commonwealth of Pennsylvania with its registered address at 932 Freeport Rd, Pittsburgh, PA. Upon information and belief, Waterfront LLC is used by Defendants as a conduit to manage and/or operate a "Burgatory" Restaurant at a given location. Waterfront LLC is the licensee on the liquor license for the Burgatory Restaurant located at 299 West Bridge Street. At all relevant times during the statutory period covered by this Complaint, Defendant Waterfront LLC has transacted business within the Commonwealth of Pennsylvania, including within this district.

35.     Defendant Surefire Restaurants - Blue Spruce, L.P. ("Blue Spruce LP") is a limited

partnership registered to do business in the Commonwealth of Pennsylvania with its registered address at 932 Freeport Rd, Pittsburgh, PA. Upon information and belief, Blue Spruce LP is used by Defendants as a conduit to manage and/or operate a "Burgatory" Restaurant at a given location. At all relevant times during the statutory period covered by this Complaint, Defendant Blue Spruce LP has transacted business within the Commonwealth of Pennsylvania, including within this district.

36.     Defendant Surefire Restaurants - Cranberry, L.P. ("Cranberry LP") is a limited partnership registered to do business in the Commonwealth of Pennsylvania with its registered address at 932 Freeport Rd, Pittsburgh, PA. Upon information and belief, Cranberry LP is used by Defendants as a conduit to manage and/or operate a "Burgatory" Restaurant at a given location. At all relevant times during the statutory period covered by this Complaint, Defendant Cranberry LP has transacted business within the Commonwealth of Pennsylvania, including within this district.

37.     Defendant Surefire Restaurants - McCandless, L.P. ("McCandless LP") is a limited partnership registered to do business in the Commonwealth of Pennsylvania with its registered address at 932 Freeport Rd, Pittsburgh, PA. Upon information and belief, McCandless LP is used by Defendants as a conduit to manage and/or operate a "Burgatory" Restaurant at a given location. McCandless LP is the licensee on the liquor license for the Burgatory Restaurant located at 700 Providence Blvd. At all relevant times during the statutory period covered by this Complaint, Defendant McCandless LP has transacted business within the Commonwealth of Pennsylvania, including within this district.

38.     Defendant Surefire Restaurants - North Shore, L.P. ("North Shore LP") is a limited partnership registered to do business in the Commonwealth of Pennsylvania with its registered

address at 932 Freeport Rd, Pittsburgh, PA. Upon information and belief, North Shore LP is used by Defendants as a conduit to manage and/or operate a "Burgatory" Restaurant at a given location. North Shore LP is the licensee on the liquor license for the Burgatory Restaurant located at 342 North Shore Drive. At all relevant times during the statutory period covered by this Complaint, Defendant North Shore LP has transacted business within the Commonwealth of Pennsylvania, including within this district.

39.    Defendant Surefire Restaurants - Waterfront, L.P. ("Waterfront LP") is a limited partnership registered to do business in the Commonwealth of Pennsylvania with its registered address at 932 Freeport Rd, Pittsburgh, PA. Upon information and belief, Waterfront LP is used by Defendants as a conduit to manage and/or operate a "Burgatory" Restaurant at a given location. At all relevant times during the statutory period covered by this Complaint, Defendant Waterfront LP has transacted business within the Commonwealth of Pennsylvania, including within this district.

40.    Defendant Surefire Restaurants - Blue Spruce, LLC ("Blue Spruce LLC") is a limited liability company registered to do business in the Commonwealth of Pennsylvania with its registered address at 932 Freeport Rd, Pittsburgh, PA. Upon information and belief, Blue Spruce LLC is used by Defendants as a conduit to manage and/or operate a "Burgatory" Restaurant at a given location. At all relevant times during the statutory period covered by this Complaint, Defendant Blue Spruce LLC has transacted business within the Commonwealth of Pennsylvania, including within this district.

41.    Defendant B-Lux Restaurants, Inc. ("B-Lux") is a corporation registered to do business in the Commonwealth of Pennsylvania with its registered address at 932 Freeport Rd, Pittsburgh, PA. Upon information and belief, B-Lux is used by Defendants as a conduit to manage

and/or operate a "Burgatory" Restaurant at a given location. B-Lux is the licensee on the liquor license for the Burgatory Restaurant located at 936 Freeport Rd. At all relevant times during the statutory period covered by this Complaint, Defendant B-Lux has transacted business within the Commonwealth of Pennsylvania, including within this district.

42.     Upon information and belief, Defendant Herky Pollock ("Pollock") is a resident of the Commonwealth of Pennsylvania. According to his LinkedIn page, Defendant Pollock is the President and Chief Executive Officer ("CEO") of Burgatory. Defendant Pollock is listed as an officer on each of the Burgatory liquor licenses.

43.     Upon information and belief, due to his position as President and CEO, Defendant Pollock regularly held and exercised the authority to: (a) hire and fire employees of the Restaurants; and (b) control the finances and operations of the Restaurants. Thus, in his capacity as President and CEO, Defendant Pollock exercises sufficient control over the labor policies and practices of the Restaurants complained of herein to be considered the employer of Plaintiff and the Classes for the purposes of the FLSA and PA State Laws.

44.     Indeed, Plaintiff believes Defendant Pollock would, on rare occasions, come into her Restaurant and give orders and directions to Tipped Employees. Plaintiff also recalls instances where Defendant Pollock gave directives to management personnel regarding the Restaurant's operations.

45.     Upon information and belief, Defendant Michael Hanley ("Hanley") is a resident of the Commonwealth of Pennsylvania. Based on publicly available information, Defendant Hanley is one of the founders of Burgatory. *See* https://www.pittsburghmagazine.com/review-burgatory/ (last visited February 7, 2025). Upon information and belief, Defendant Hanley remains a part owner of Burgatory and is involved in the day-to-day operations of the Restaurants. For

example, according to Allegheny County health inspection reports, Defendant Hanley is the contact individual for the Homestead/Waterfront Restaurant (https://eapps.alleghenycounty.us/restaurant/RestaurantDetailBS.aspx?ID=201404100005, last visited February 7, 2025), and the North Fayette/The Pointe Restaurant (https://eapps.alleghenycounty.us/restaurant/RestaurantDetailBS.aspx?ID=201209140001, last visited February 7, 2025). Defendant Hanley is listed as an officer on each of the Burgatory liquor licenses.

46.    Indeed, Plaintiff believes Defendant Hanley, on occasion, came into her Restaurant and gave orders and directions to employees, including management personnel.

47.    Thus, upon information and belief, due to his position as part owner and operator of Burgatory, Defendant Hanley regularly held and exercised the authority to: (a) hire and fire employees of the Restaurants; and (b) control the finances and operations of the Restaurants. Thus, Defendant Hanley exercises sufficient control over the labor policies and practices of the Restaurants complained of herein to be considered the employer of Plaintiff and the Classes for the purposes of the FLSA and PA State Laws.

48.    Upon information and belief, Defendant Gerald Dilembo ("Dilembo") is a resident of the Commonwealth of Pennsylvania. Upon information and belief, Dilembo is the brother-in-law of Defendant Hanley and a co-owner in the Burgatory Restaurants. Dilembo is listed as an officer on each of the Burgatory liquor licenses.

49.    Thus, upon information and belief, due to his position as part owner and operator of Burgatory, Defendant Dilembo regularly held and exercised the authority to: (a) hire and fire employees of the Restaurants; and (b) control the finances and operations of the Restaurants. Thus, Defendant Dilembo exercises sufficient control over the labor policies and practices of the Restaurants complained of herein to be considered the employer of Plaintiff and the Classes for

the purposes of the FLSA and PA State Laws.

50.    Upon information and belief, Defendant Vic Bovalino ("Bovalino") is a resident of the Commonwealth of Pennsylvania. Defendant Bovalino has identified himself as both Director of Operations at Surefire Hospitality and President of Surefire Management Group.

51.    Plaintiff recalls Defendant Bovalino coming into her Restaurant on occasion to assist in the running of the Restaurant and would direct employees, including managers, regarding what to do.

52.    Plaintiff further recalls Defendant Bovalino delegating when and where monetary funds are to be spent (i.e., whether to repair a pipe). In addition, Plaintiff understands that Bovalino has gone to other Burgatory Restaurants and controlled their operations. To the best of Plaintiff's knowledge, Defendant Bovalino also makes menu decisions that affect all Restaurant locations.

53.    Thus, upon information and belief, due to his positions within the Burgatory Entities Defendant Bovalino regularly held and exercised the authority to: (a) hire and fire employees of the Restaurants; and (b) control the finances and operations of the Restaurants. Thus, Defendant Bovalino exercises sufficient control over the labor policies and practices of the Restaurants complained of herein to be considered the employer of Plaintiff and the Classes for the purposes of the FLSA and PA State Laws.

54.    Defendants are a single integrated enterprise with a high degree of interrelated and unified operations, sharing a common officer. Each of these Defendants share the common labor policies and practices complained of herein.

55.    Evincing the interrelated enterprise of Defendants, in addition to having separate entities hold the liquor license while another entity maintains the ownership of the restaurant, many of the LLC Burgatory Entities are the general partner of the L.P. Burgatory Entities. Defendant

Surefire Management, LLC is the general partner of Surefire Management Group, L.P. Surefire Restaurants, LLC is the general partner of Surefire Hospitality Group, L.P. Surefire Restaurants – Blue Spruce LLC is the general partner of Surefire Restaurants – Blue Spruce L.P. Surefire Restaurants – Cranberry, LLC[2] is the general partner of Surefire Restaurants Group – Cranberry, L.P.[3] Surefire Restaurants – McCandless LLC is the general partner of Surefire Restaurants Group – McCandless, L.P. Surefire Restaurants – North Shore LLC is the general partner of Surefire Restaurants Group – North Shore, L.P. Surefire Restaurants – Waterfront LLC is the general partner of Surefire Restaurants Group – Waterfront, L.P.

56.     Upon information and belief, the sole reason for separate corporate entities was to maintain separate liquor licenses and limit the liability of Defendants.

57.     At all relevant times during the statutory period covered by this Complaint, Defendants, through their actions as an integrated enterprise, have transacted business within the Commonwealth of Pennsylvania, including within this district.

58.     At all relevant times during the statutory period covered by this Complaint, Defendants have operated as a "single enterprise" within the definition of Section 203(r)(1) of the FLSA. Defendants uniformly operated its restaurants under common control for a common business purpose.

59.     Defendants are engaged in related activities, *e.g.*, activities which are necessary for the operation and maintenance of the Restaurants in the Commonwealth of Pennsylvania.

60.     Defendants are a single employer with a high degree of interrelated and unified

---

[2] Surefire Restaurants – Cranberry, LLC was formerly known as Surefire Restaurants – Gardens LLC.

[3] Surefire Restaurants Group – Cranberry L.P. was formerly known as Surefire Restaurants Group – Gardens LLC.

operations, sharing common officers. In addition, upon information and belief, Defendants share common human resources and payroll services, including the common labor policies and practices complained of herein.

61.     Further evidencing the interrelation and unified operation of the Burgatory Entities, each of the entities maintain the same corporate address and all have a common ownership/management structure. Further evidence of the interrelated nature of Defendants, Burgatory maintains one website which references each location.

62.     Plaintiff is unaware of the names and the capacities of those defendants sued as DOES 1 through 10 but will seek leave to amend this Complaint once their identities become known to Plaintiff. Upon information and belief, Plaintiff alleges that at all relevant times each defendant was the officer, director, employee, agent, representative, alter ego, or co-conspirator of each of the Defendants. In engaging in the alleged conduct herein, defendants acted in the course, scope of, and in furtherance of the aforementioned relationship. Accordingly, unless otherwise specified herein, Plaintiff will refer to all defendants collectively as "Defendants" and each allegation pertains to each of the defendants.

## **JURISDICTION AND VENUE**

63.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 201 *et seq*.

64.     Further, this Court also has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367 because those claims derive from a common nucleus of operative facts.

65.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(ii) as a substantial part of the acts or omissions giving rise to the claims alleged herein occurred within this judicial district, and Defendants are subject to personal jurisdiction in this district.

66.     This Court is empowered to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

## FACTUAL ALLEGATIONS

67.     The crux of the FLSA and PA State Laws is, *inter alia*, that all employees are entitled to be paid mandated minimum wages for all hours worked.

68.     Contrary to these basic protections, Plaintiff and the members of the Classes were deprived of the mandated minimum wage for all hours they worked.

69.     Plaintiff and the members of the Classes are, or were, Tipped Employees employed by Defendants.

70.     Defendants govern and administer each Restaurant in a virtually identical manner so that, among other things, customers can expect and receive the same kind of customer service regardless of the restaurant location that a customer may visit.

71.     Indicative of this, Plaintiff recalls numerous instances where Tipped Employees from Plaintiff's Restaurant were called upon to work at another Restaurant for a shift. In addition, Plaintiff also recalls instances where Tipped Employees at other Restaurants were brought into Plaintiff's Restaurant to work a shift. During such instances, Plaintiff does not recall any instance where the individual had to receive new employee training prior to working that shift.

72.     Further, Plaintiff recalls instances where Tipped Employees from the Fox Chapel/Waterworks, Homestead/Waterfront, and North Shore Restaurants all transferred to her Restaurant. In such instances, Plaintiff does not recall any instance where the individual had to receive new employee training after being transferred and working in the same position as they did at the prior location. The only time an employee had to receive additional training is if they were switching positions (e.g., from server to bartender, the transferred employee would receive bartender training).

16

73.     Upon information and belief, Defendants' Restaurants operate under uniform policies/procedures applicable to all members of the Classes, including subjecting Tipped Employees to the unlawful pay practices complained of herein.

74.     For example, the "Training Bible" Defendants made available to Plaintiff identifies all Restaurants. Accordingly, upon information and belief, it is used at all Restaurants.

75.     Thus, as set forth herein, Defendants operate as a single, integrated enterprise through the use of, *inter alia*, a common business brand name, common decor, and common menu; common marketing; the use of the same employees at multiple locations; the transfer of employees between locations; and the distribution of common employee guidelines and procedures across different locations.

### PLAINTIFF'S EXPERIENCE WORKING FOR DEFENDANTS

76.     As set forth above, Plaintiff was employed by Defendants as a "server" in their Murrysville/Blue Spruce Restaurant location in the Commonwealth of Pennsylvania. Plaintiff began working at this location from on or about June 3, 2021. She currently works two shifts per week at this location.

77.     Typically, when working a lunch shift, Plaintiff would work with two to three other Servers during the week and usually four to five other Servers during the weekend. When working a dinner shift, Plaintiff would work with three to four other Servers during the week and usually four to six other Servers during the weekend.

78.     During her training shifts, Plaintiff was paid the minimum wage of $7.25 per hour. In addition, Plaintiff was also paid $7.25 per hour when called in for meetings that were held when she was not otherwise scheduled to work. Finally, Plaintiff was also paid $7.25 per hour when training a new Tipped Employee.

79.    Other than these instances, Plaintiff was paid an hourly cash wage of $2.83 from Defendants and earned tips from customers who chose to leave her a gratuity.

80.    Plaintiff does not ever recall her hourly wage being raised above $2.83 for any shift she worked for Defendants, irrespective of the amount of tips she earned or the type of work she performed.

81.    Plaintiff was paid by Defendants on a bi-weekly basis. Her paychecks are from "Surefire Restaurants Group – Blue Spruce, LP."

82.    Plaintiff would receive her work schedule, messages from managers and co-workers, and be able to switch her schedule/pick up additional shifts via the Defendants' use of the "Hot Schedules" messaging app.

83.    From the start of her employment until on or about September 8, 2023, Plaintiff typically worked five days per week. She usually had off two days during the week and would typically work a double shift on Saturdays and Sundays.

84.    After September 8, 2023, Plaintiff would work twice per week, usually on Wednesdays and Sunday nights.

85.    When working Wednesday nights, Plaintiff would typically begin work at 5:00 p.m. and finish working around 9:30-9:45 p.m. Occasionally, Plaintiff was required to stay even longer and specifically recalls one instance where she did not leave until approximately 10:30 p.m. On Wednesday nights, the Restaurant would close to the public at 9:00 p.m.

86.    When working Sunday nights, Plaintiff would typically begin work at 4:00 p.m. and finishing working around 9:30-9:45 p.m. Occasionally, she would work as late as approximately 10:15 p.m. On Sunday nights, the Restaurant would close to the public at 9:00 p.m.

87.     Until the end of 2024, Plaintiff would usually work a double shift on Sunday. When working a double shift, she would come in for work at 10:30 a.m. Plaintiff's Restaurant would open to the public at 11:00 a.m.

88.     When working an opening shift, Plaintiff would typically spend approximately one (1) hour doing prep work before the restaurant opened to the public and afterwards when it was slow. Indeed, Plaintiff recalls numerous instances where she did not receive her first table until approximately 12:00 p.m. On those instances, Plaintiff would perform prep work until receiving her first table.

89.     This prep work included, among others, performing the following tasks: (i) setting up the beverage station (which included, among other things, wiping down the station, making sweet and unsweetened tea, making coffee, wiping down and putting nozzles onto the soda machine, stocking the beverage station with to-go cups, lids, straws, and kids' cups, and stocking the sugar caddies), (ii) cutting lemons (typically two buckets worth), (iii) clean the table bases (with a towel and spray cleaning bottle), (iv) dusting the lamps in the Restaurant, (v) reassemble the table caddies with the ketchup bottles from the back of the house and put them on the customer tables, and (vi) ensure there was enough rolls of silverware for the day and, if necessary, roll silverware.

90.     On Sundays, extra prep work was required. This work included, among other things, cleaning the booths themselves, cleaning under the booths, reassembling the booths which were broken down by the manager on Sunday mornings, and then cleaning the floors after the booths were reassembled.

91.     When working a closing shift, Plaintiff would typically spend approximately one (1) hour doing break-down work after the restaurant closed to the public or beforehand when it

was slow and/or Plaintiff no longer had any customer responsibility.

92. This break-down work included performing, among others, the following tasks: (i) breaking down the beverage station (which included undoing everything done at the start of the morning shift), (ii) taking out trash, (iii) wiping down all stainless in the "expo" area and at the server station, (iv) sweeping the "expo" area, (v) clean and wipe down the "command center" which is where the POS system was located, (vi) stock the "command center" with to-go boxes, to-go silverware, napkins, and beverage napkins, (vii) fold all to-go boxes used by the kitchen, and (viii) stack all chairs in the Restaurant and sweep the dining area.

93. Notably, certain of these break-down work (a/k/a "closing side work") could not be performed until all customers had left the Restaurant. This included the stacking of chairs and sweeping of the dining area.

94. During her shift, Plaintiff would perform "running side work." These tasks included, among other things: (i) taking out trash when the bin was full, (ii) rolling silverware[4], (iii) restocking the beverage station to ensure they did not run out of items, (iv) restocking the command center to ensure that center did not run out of items, and (v) fold to-go boxes used by the kitchen if they were running low on such boxes. Plaintiff estimates that she spent at least 30 to 45 minutes per shift performing such tasks.

95. Many of these required tasks are detailed in the "Training Bible" made available to all Servers. Indeed, this document is made available to Tipped Employees via Defendants' burgatory.com website.

96. Further, the side work tasks that Defendants required Tipped Employees to perform

---

[4] Notably, the Restaurant had a limited supply of silverware, and, thus, Plaintiff recalls numerous instances where she had to roll silverware during her shift because the Restaurant had run out and had to wait for the dishwasher to clean it so the silverware could be rolled for new customers.

are also detailed in individual side work sheets that are provided to Tipped Employees by managers when performing closing side work.

97.     Importantly, Servers do not receive any tips from bartenders for the "to-go" orders processed by the bartenders (e.g., online orders or orders called in via the telephone) even though such orders use the to-go boxes folded by the Servers.

98.     Between her opening, closing, and running side work, Plaintiff estimates that she spent well in excess of 20% of her time performing such side work.

99.     Indeed, it was the policy of the Restaurants that Tipped Employees were to always remain busy. Accordingly, Plaintiff recalls instances during her shifts where her customers did not need her and there was no side work that could be done, so in such instances she would run food for other Servers or bus another Servers' tables. Plaintiff believes this occurred on a daily basis.

100.     Plaintiff recalls several instances where her Restaurant was closed to the public due to an unforeseen issue (e.g., a water main break, a loss of electricity due to a car striking a power line, and problem with the kitchen ventilation). In those instances, Defendants had Plaintiff and other Tipped Employees perform additional cleaning work including, but not limited to, washing the walls of the back of the house (e.g., the server prep area, dry storage area), and cleaning the outside patio heaters. Such work, depending on the instance, could last anywhere from an hour to several hours before either Plaintiff was sent home or the Restaurant reopened to the public.

101.     During these extreme instances, Plaintiff was paid her normal server rate of $2.83 per hour.

102.     Importantly, Server does not share their tips with other Servers for "to-go" orders processed by that particular Server (e.g., orders that come in via UberEats or GrubHub) nor are they required to share their tips with other Servers who assist them in delivering their food to

particular table or bussing that table.

103.    All told, Plaintiff estimates that she spent at least 40% to 50% of her time performing duties for which she herself did not directly receive any tips.

104.    Notably, although Defendants required Plaintiff and other Tipped Employees to sweep the floors and put up the chairs in the Restaurants and paid them a subminimum wage for such work, Defendants employed a cleaning crew to, among other things, mop the floors after the Restaurant was closed. Upon information and belief, Defendants paid this cleaning crew at or above the mandated minimum wage.

105.    At the end of her shift, Plaintiff would go into the manager's office to surrender a portion of her tips in accordance with Defendants' mandatory tip-out policy. Per the policy, Plaintiff had to surrender 1.5% of her total sales to the bar for their tips and an additional 1.5% of her total sales to the hosts. These amounts would then be placed in envelopes by the manager who would then ostensibly give these tips to the bar staff and hosts.

106.    Notably, to the best of Plaintiff's knowledge, the manager did not record the amount of tips surrendered by Plaintiff to the bar and hosts. Rather, upon information and belief, these amounts remained, according to Defendants' records, as tips received and taken home by Plaintiff – even though they were not. Indeed, Plaintiff has on occasion checked the amount of tips she purportedly received, as recorded in Defendants' records, and determined that the records included amounts she surrendered to the bar and hosts per Defendants' tip out policy.

107.    When Plaintiff inquired as to why these amounts were remaining attributable to Plaintiff even though she no longer had these amounts due to Defendants' tip out policy, Plaintiff's manager shrugged his shoulders and told her "that's the way it is."

108.    Plaintiff also recalls a conversation with Eric Bishop, the individual in charge of

creating the Restaurants' employee handbooks and training manuals, wherein she also complained about being allocated income for which she did not take home as it was surrendered to Defendants pursuant to their tip out policy, and Mr. Bishop responded with a comment along the lines of "well, someone will eventually sue."

109.    Moreover, Plaintiff was required to tip out 1.5% of her total sales for a given shift to the host even on the regular occasions when hosts were either cut or came in late and thus did not work an entire shift. Notably, in such instances when there was no host working, Plaintiff and other servers had to perform the host's job duties, which included among other things bussing and cleaning tables after a guest left.

110.    Plaintiff recorded her work time by logging into Defendants' timekeeping system through the point-of-sale ("POS") system. During the entire course of her employment, Plaintiff believes that Defendants' POS system was the "Aloha" timekeeping system.

111.    The precise amount of time Plaintiff recorded as working each week, upon information and belief, is maintained in Defendants' employment and/or payroll records.

112.    Plaintiff believes that the compensation and work policies described herein applied to both her and all the other Tipped Employees as, at no time, was she informed that a policy was unique to her. Rather, she was constantly told that a particular policy or practice was simply the way things were done.

## THE TIP CREDIT PROVISION & REQUIREMENTS

### *FLSA Requirements*

113.    Rather than pay its Tipped Employees the applicable minimum wage (either the applicable state minimum wage or the federal minimum wage, whichever is higher), Defendants initially chose to take a tip credit and pay these employees less than the applicable minimum wage.

114.    Under applicable law, in certain circumstances, it is permissible for an employer to take a tip credit and pay its employees less than the mandated minimum wage, provided that the employee's tips received from customers plus the tip credit wage paid by the employer equals at least the applicable minimum wage.

115.    The applicable requirements for an employer to claim a tip credit under federal law are set forth in 29 C.F.R. § 531.59.

116.    The Department of Labor ("DOL") has set forth these requirements in an easy to ready Fact Sheet, specifically Fact Sheet #15: Tipped Employees Under the Fair Labor Standards Act (FLSA) ("Fact Sheet #15").

117.    Fact Sheet #15 specifically states that:

the maximum tip credit that an employer can currently claim under the FLSA is $5.12 per hour (the minimum wage of $7.25 minus the minimum required cash wage of $2.13).

118.    As is made plain in both 29 C.F.R. § 531.59 and Fact Sheet #15, in order to claim a tip credit, the employer must comply with five strict notification requirements.

119.    First, the employer must notify the employee of the amount of the cash wage the employer is paying the Tipped Employee and that amount must equal at least $2.13 per hour.

120.    Second, the employer must notify the Tipped Employee of the amount the employer is claiming as a tip credit. In accordance with the FLSA, the tip credit claimed cannot exceed $5.12 per hour.

121.    Third, the employer must inform the Tipped Employee that the tip credit claimed cannot exceed the actual amount of tips received by the employee. In effect, the employer must inform the employee that the employee must still earn the mandated minimum of $7.25 per hour between the amount of the tip credit taken by the employer and the amount of tips earned by the

employee.

122.    Indeed, the Regulation specifically states: "If the employee received less than the maximum tip credit amount in tips, the employer is required to pay the balance so that the employee receives at least the minimum wage with the defined combination of wages and tips." 29 C.F.R. § 531.59(b).[5]

123.    Fourth, the employer must notify the Tipped Employee that all tips received are to be retained by the employee except for a valid tip pooling arrangement.

124.    Finally, the Tipped Employee must be informed by the employer that the tip credit will not apply unless the employee has been informed of these provisions.

125.    Notably, courts in this Circuit have held that the requirements set forth in the applicable regulation, 29 C.F.R. § 531.59, set forth the same requirements as set forth in statute (29 U.S.C. § 203(m)) itself.

126.    An employer bears the burden of showing that it has satisfied all of the notification requirements before any tips can be credited against the employee's hourly wage. If an employer cannot demonstrate its compliance with this notification requirement, no credit can be taken and the employer is liable for the full minimum wage.

127.    As set forth herein, Defendants failed to comply with certain of the FLSA's provisions regarding the claiming of a tip credit.

128.    In addition, applicable regulations (specifically, 29 C.F.R. § 516.28(a)(4)) require

---

[5] For example, where a tipped employee earns less in tips than the tip credit claimed, the employer is required to make up the difference. Stated another way, if a tipped employee earns less than $5.12 per hour in tips (the maximum tip credit permissible where the employer pays the employee $2.13 per hour), the employer must raise that tipped employee's hourly cash component the necessary amount above $2.13 per hour so as to ensure that the employee earns at least $7.25 per hour – the mandated minimum wage.

an employer to maintain records of "Hours worked each workday in any occupation in which the employee does not receive tips, and total daily or weekly straight-time payment made by the employer for such hours."

129.    Defendants failed to comply with this recordkeeping requirement. Instead, Defendants had Plaintiff clock in under the "server" job code for all her time worked (unless attending a meeting, in training, or training another employee).

### *Pennsylvania's Requirements*

130.    Pennsylvania state law has a substantially similar requirement to the FLSA's tip notification requirements. *See* 43 P.S. § 333.103(d).

131.    Importantly, however, Pennsylvania mandates a higher minimum cash wage and requires employers to pay at least $2.83 per hour. Thus, under Pennsylvania law, the maximum tip credit is $4.42 per hour.[6]

132.    In addition, 34 Pa. Code § 231.34 also requires employers to maintain payroll records that contain the following information:

1)  A symbol or letter placed on the pay records identifying each employee whose wage is determined in part by tips;

2)  Weekly or monthly amount reported by the employee, to the employer, of tips received. This may consist of reports made by the employees to the employer on IRS Form 4070;

3)  Amount by which the wages of each tipped employee have been deemed to be increased by tips, as determined by the employer, not in excess of 45% of the applicable statutory minimum wage until January 1, 1980 and thereafter 40% of the applicable statutory minimum

---

[6] Like the FLSA, Pennsylvania law states that the tip credit claimed by the employer cannot exceed the amount of tips actually received by the employee. *See* 43 P.S. § 333.103(d).

wage. The amount per hour which the employer takes as a tip credit shall be reported to the employee in writing each time it is changed from the amount per hour taken in the preceding week;

4)   Hours worked each workday in any occupation in which the tipped employee does not receive tips and total daily or weekly straight-time payment made by the employer for such hours; and

5)   Hours worked each workday in occupations in which the employee received tips and total daily or weekly straight-time earnings for the hours.

## DEFENDANTS' FAILURE TO NOTIFY TIPPED EMPLOYEES

133.    As explained above, the DOL has very specific requirements regarding what an employer must notify his/her employee of if that employer intends to claim a tip credit.

134.    Rather than comply with the notification requirements set forth in Fact Sheet #15 and the applicable regulations, Defendants chose to simply pay their Tipped Employees a subminimum wage (in Plaintiff's case, $2.83 per hour).

135.    The Third Circuit and district courts across the country have held that where an employer fails to satisfy any one of the notification requirements, including paying employees for all hours worked, that employer forfeits the tip credit and must pay the employee the full minimum wage.

136.    To the best of Plaintiff's recollection, when she was hired, she recalls only being told that she would be paid $2.83 per hour when working as a "server." Indeed, in the "welcome" email she received from Defendants, it only mentions that she was "hired as a Server at a rate of $2.83/Hourly."

137.    Indeed, none of Plaintiff's paystubs indicate that a tip credit is being claimed, much less the amount of tip credit being per claimed per hour.

138.    Moreover, Plaintiff recalls several instances where she worked a shift and received little to no tips but does not recall her hourly wage being raised so that she earned at least $7.25 per hour worked.

139.    Further, in instances where a customer leaves without paying their bill (referred to in the restaurant industry as a "dine and dash"), Plaintiff was threatened by Defendants that she had to forfeit a portion of her tips to cover that customer's bill. Plaintiff refused. Although Defendants ultimately comped the check, seeking to have Plaintiff forfeit some of her tips is illegal as applicable wage laws require a Tipped Employee to keep all tips received (except for a valid tip pool).

140.    In addition, Plaintiff is aware of instances where Defendants required bartenders to forfeit some of their tips to cover the bar's cash shortages.

141.    Further, if a catering order received a tip, that tip was shared with the kitchen manager and kitchen staff (e.g., the cooks).

142.    Finally, Plaintiff recalls several instances where a general manager would fill in as a bartender and partake in the tip pool despite (i) retaining her authority as the general manager and (ii) earning more than the tip credit wage.

143.    These policies/practices are in clear contravention of the strict mandates of the tip credit provisions.

144.    In addition, Defendants failed to separately track and record the time worked where Plaintiff was not earning tips and could not earn tips because the Restaurant was closed to the public. This was in contravention of applicable regulations, including 29 C.F.R. § 516.28 and 43 P.S. 231.34.

145.    Stated another way, Defendants failed to notify employees in writing of the hours

worked where the Tipped Employee did not receive tips. Rather, Defendants simply claimed a tip credit for all hours worked by Plaintiff and other Tipped Employees after said individuals completed their training.

146.    Plaintiff alleges that each of the above actions was done willfully by Defendants.

**DEFENDANTS' POLICIES/PRACTICES FOR UNRELATED/EXCESSIVE SIDE WORK**

147.    The FLSA and PMWA recognize that individuals employed in tipped occupations, such as the Tipped Employees here, often *engage* in more than one *occupation*—one where the tipped employee customarily receives tips and one where the tipped employee does not.

148.    Indeed, applicable FLSA regulations, specifically 29 C.F.R. § 531.56, provides that when a tipped employee is employed in "dual jobs", one where he/she would customarily receive a tip and one where he/she would not, the employer is not entitled to take the tip credit for time spent engaged in the non-tipped occupation. *See* 29 C.F.R. § 531.56.

149.    As Plaintiff's experience makes plain, Defendants required Tipped Employees to regularly perform non-tip generating work including, but not limited to, taking out the trash, putting up chairs, sweeping the floor, cleaning the table bases (with a towel and spray cleaning bottle), dusting the Restaurant's lamps, and rolling silverware.

150.    Despite performing such work that does not customarily receive a tip (as none could be generated due to the restaurant being closed to the public), Defendants nonetheless took a tip credit for such time.

151.    In addition, Defendants also violated applicable wage and hour laws by enforcing a policy or practice of requiring Tipped Employees to perform non-tipped work that, even if it was related to their tipped occupation, exceeded 20 percent of their time worked in one or more individual workweeks.

152.    Indeed, based on her job duties detailed above, Plaintiff estimates that she regularly spent in excess of 20% of her time performing "side work" while on duty as a server. The precise amount of this side work, Plaintiff believes can be determined through a review of Defendants' time records for Plaintiff and the sales receipts associated with Plaintiff for each day worked.

153.    In short, Defendants routinely and regularly required Plaintiff and other Tipped Employees to perform excessive and/or unrelated side work in contravention of applicable law.

154.    Despite this, Plaintiff never recalls her hourly wage being raised to the full minimum wage to account for such time performing said excessive side work.

## CLASS & COLLECTIVE ACTION ALLEGATIONS

155.    Plaintiff brings this action on behalf of the Collective Class as a collective action pursuant to the Fair Labor Standards Act. Plaintiff also brings this action as a class action pursuant to Fed. R. Civ. P. 23 on behalf of herself and the PA Class for claims under the PA State Laws.

156.    The claims under the FLSA may be pursued by those who opt-in to this case pursuant to 29 U.S.C. §216(b). The claims brought pursuant to the PA State Laws may be pursued by all similarly-situated persons who do not opt-out of the PA Class pursuant to Fed. R. Civ. P. 23.

157.    Upon information and belief, the members of each of the Classes are so numerous that joinder of all members is impracticable. While the exact number of the members of these Classes is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes there are over 30 individuals in each of the Classes.

158.    Defendants have acted or have refused to act on grounds generally applicable to the Classes, thereby making final injunctive relief or corresponding declaratory relief with respect to the Classes as a whole, appropriate.

159.    The claims of Plaintiff are typical of the claims of the Classes she seeks to represent.

Plaintiff and the members of the Classes work or have worked for Defendants and were subject to the same compensation policies and practices.

160.    Common questions of law and fact exist as to the Classes that predominate over any questions only affecting them individually and include, but are not limited to, the following:

(a)    whether Defendants have failed to pay the full minimum wage for each hour worked;

(b)    whether Defendants satisfied each of the requirements in order to claim a tip credit against each hour worked;

(c)    whether Defendants were precluded from claiming the tip credit during the period encompassed by this Complaint; and

(d)    whether Plaintiff and members of the Classes are entitled to compensatory damages, and if so, the means of measuring such damages.

161.    Plaintiff will fairly and adequately protect the interests of the Classes as her interests are aligned with those of the members of the Classes. Plaintiff has no interests adverse to the Classes she seeks to represent, and has retained competent and experienced counsel.

162.    The class action/collective action mechanism is superior to other available methods for a fair and efficient adjudication of the controversy. The damages suffered by individual members of the Classes may be relatively small when compared to the expense and burden of litigation, making it virtually impossible for members of the Classes to individually seek redress for the wrongs done to them.

163.    Plaintiff and the Classes she seeks to represent have suffered and will continue to suffer irreparable damage from the illegal policy, practice and custom regarding Defendants' pay practices.

164.    Defendants have violated, and continue to violate, the FLSA, 29 U.S.C. §§ 201 *et seq.* The foregoing conduct, as alleged, constitutes a willful violation of the FLSA within the meaning of 29 U.S.C. § 255(a) and willful violation of the PMWA.

**FIRST CLAIM FOR RELIEF**
**FAIR LABOR STANDARDS ACT MINIMUM WAGE VIOLATIONS**
**(On Behalf of the Collective Class)**

165.    Plaintiff, on behalf of herself and the Collective Class, re-alleges and incorporates by reference the paragraphs above as if they were set forth again herein.

166.    At all relevant times, Defendants have had gross revenues in excess of $500,000.

167.    At all relevant times, Defendants have been and continue to be, an employer engaged in interstate commerce, within the meaning of the FLSA, 29 U.S.C. §§ 206(a) and 207(a).

168.    At all relevant times, Defendants have employed, and/or continue to employ, Plaintiff and each of the Collective Class Members within the meaning of the FLSA.

169.    Pursuant to Defendants' compensation policies, rather than pay Tipped Employees the federally-mandated minimum wage, Defendants took a tip credit and paid Tipped Employees only a sub-minimum wage.

170.    Defendants have violated, and continues to violate, the FLSA, 29 U.S.C. §§ 201 *et seq.* The foregoing conduct, as alleged, constitutes a willful violation of the FLSA within the meaning of 29 U.S.C. § 255(a).

171.    Due to Defendants' FLSA violations, Plaintiff, on behalf of herself and the members of the Collective Class, are entitled to recover from the Defendants, compensation for unpaid wages; an additional equal amount as liquidated damages; and reasonable attorneys' fees and costs and disbursements of this action, pursuant to 29 U.S.C. § 216(b).

## SECOND CLAIM FOR RELIEF
## FAIR LABOR STANDARDS ACT MINIMUM WAGE VIOLATIONS
### (On Behalf of the Collective Class)

172.    Plaintiff, on behalf of herself and the Collective Class, re-alleges and incorporates by reference the paragraphs above as if they were set forth again herein.

173.    As set forth above, Defendants failed to comply with the FLSA, its applicable regulations (including 29 C.F.R. § 531.56(e)), and DOL guidance (including the Department of Labor Field Operations Handbook §30d00(e) and §30d00(f)) by requiring Plaintiff and the members of the Collective Class to perform non-tipped labor unrelated to their tipped occupation over the course of their regular workweek, while paying said employees at the sub-minimum wage, tip credit rate.

174.    Examples of such non-tipped labor unrelated to the primary duties of Tipped Employees include, but are not limited to, taking out the trash, putting up chairs, sweeping the floor, cleaning the table bases (with a towel and spray cleaning bottle), dusting the Restaurant's lamps, and rolling silverware.

175.    Pursuant to Defendants' compensation policies, rather than pay Tipped Employees the full minimum wage for this work, Defendants took a tip credit and paid Tipped Employees only the tip-credit wage for the time spent performing this non-tip generating work.

176.    Defendants have violated, and continue to violate, the FLSA, 29 U.S.C. §§ 201 et seq. The foregoing conduct, as alleged, constitutes a willful violation of the FLSA within the meaning of 29 U.S.C. § 255(a).

177.    Due to Defendants' FLSA violations, Plaintiff, on behalf of herself and the members of the Collective Class, are entitled to recover from Defendants, compensation for unpaid wages; an additional equal amount as liquidated damages; and reasonable attorneys' fees and costs and disbursements of this action, pursuant to 29 U.S.C. § 216(b).

**THIRD CLAIM FOR RELIEF**
**FAIR LABOR STANDARDS ACT MINIMUM WAGE VIOLATIONS**
**(On Behalf of the Collective Class)**

178.    Plaintiff, on behalf of herself and the Collective Class, re-alleges and incorporates by reference the paragraphs above as if they were set forth again herein.

179.    As set forth above, Defendants failed to comply with the FLSA, its applicable regulations (including 29 C.F.R. § 531.56(e)), and DOL guidance (including the Department of Labor Field Operations Handbook §30d00(e) and §30d00(f)) by requiring Plaintiff and the members of the Collective Class to perform non-tipped labor related to their tipped occupation for substantial and unreasonable amounts of time in excess of twenty percent (20%) of their regular workweek, and at times that are not contemporaneous to direct-service duties, while paying said employees at the sub-minimum wage, tip credit rate.

180.    Examples of such non-tipped labor related to the primary duties of Tipped Employees include, but are not limited to, cutting lemons, breaking down/putting together the server station, and rolling silverware.

181.    Defendants required Plaintiff and members of the Collective Class to perform such related but non-tipped work for substantial and unreasonable periods of times prior to waiting on any customers, after waiting on last customers, prior to the restaurants' opening for business, and following the restaurants' close for business.

182.    Pursuant to Defendants' compensation policies, rather than pay Tipped Employees the full minimum wage for this work, Defendants took a tip credit and paid Tipped Employees only the tip-credit wage for the time spent performing this non-tip generating work.

183.    Defendants have violated, and continues to violate, the FLSA, 29 U.S.C. §§ 201 *et seq.* The foregoing conduct, as alleged, constitutes a willful violation of the FLSA within the meaning of 29 U.S.C. § 255(a).

184.     Due to Defendants' FLSA violations, Plaintiff, on behalf of herself and the members of the Collective Class, are entitled to recover from Defendants, compensation for unpaid wages; an additional equal amount as liquidated damages; and reasonable attorneys' fees and costs and disbursements of this action, pursuant to 29 U.S.C. § 216(b).

**FOURTH CLAIM FOR RELIEF**
**PENNSYLVANIA MINIMUM WAGE ACT– MINIMUM WAGE VIOLATIONS**
**(On Behalf of the PA Class)**

185.     Plaintiff, on behalf of herself and the members of the PA Class, re-alleges and incorporates by reference the paragraphs above as if they were set forth again herein.

186.     At all relevant times, Defendants have employed, and/or continue to employ, Plaintiff and each of the PA Class Members within the meaning of the PMWA.

187.     Pursuant to Defendants' compensation policies, rather than pay Tipped Employees the Pennsylvania mandated minimum wage, Defendants improperly took a tip credit and paid Tipped Employees a subminimum wage. The result of this conduct was that Tipped Employees were paid at a rate well below the Pennsylvania minimum wage.

188.     Pursuant to Defendants' compensation policies, rather than pay Tipped Employees the required minimum wage in Pennsylvania, Defendants took a tip credit and paid Tipped Employees a subminimum wage.

189.     At relevant times in the period encompassed by this Complaint, Defendants had a willful policy and practice of failing to satisfy the notification requirements in order for Defendants to claim the tip credit.

190.     As a result of Defendants' willful practices, Defendants were not entitled to claim the tip credit and pay Plaintiff and the members of the PA Class less than the Pennsylvania minimum wage for all hours worked.

191.     Defendants have violated, and continue to violate, the PMWA, 43 Pa. C.S.C. §

333.101 *et seq.*

192.     Due to the Defendants' violations, Plaintiff, on behalf of herself and the members of the PA Class, are entitled to recover from Defendants the amount of unpaid minimum wages, attorneys' fees and costs.

## FIFTH CLAIM FOR RELIEF
## PENNSYLVANIA WAGE PAYMENT COLLECTION LAW
### (On Behalf of the PA Class)

193.     Plaintiff, on behalf of herself and the members of the PA Class, re-alleges and incorporate by reference the paragraphs above as if they were set forth again herein.

194.     At all relevant times, Defendants have employed, and/or continue to employ, Plaintiff and each of the PA Class Members within the meaning of the WPCL.

195.     Pursuant to the WPCL, 43 Pa. S. § 260.1 *et seq.* Plaintiff and the members of the PA Class were entitled to receive all compensation due and owing to them on their regular payday.

196.     As a result of Defendants' unlawful policies, Plaintiff and the members of the PA Class have been deprived of compensation due and owing.

197.     For example, Defendants unilaterally altered the compensation scheme Plaintiff had agreed to—earning at least the mandated minimum wage—to a scheme whereby Defendants only paid Plaintiff a subminimum wage.

198.     Plaintiff, on behalf of herself and the members of the PA Class, are entitled to recover from Defendants the amount of unpaid compensation, and an additional amount of 25% of the unpaid compensation as liquidated damages.

## SIXTH CLAIM FOR RELIEF
## PENNSYLVANIA WAGE PAYMENT COLLECTION LAW
### (On Behalf of the PA Class)

199.     Plaintiff, on behalf of herself and the members of the PA Class, re-alleges and incorporate by reference the paragraphs above as if they were set forth again herein.

200.    At all relevant times, Defendants have employed, and/or continues to employ, Plaintiff and each of the PA Class Members within the meaning of the WPCL.

201.    The purpose of the WPCL is to allow employees to receive the benefit of the contract for which they agreed to with their employer.

202.    Consequently, pursuant to the WPCL, 43 Pa. S. § 260.1 *et seq.* Plaintiff and the members of the PA Class were entitled to receive the benefit of the contract for which they agreed to with Defendants.

203.    As a result of Defendants' unlawful policies, Plaintiff and the members of the PA Class have been deprived of compensation due and owing.

204.    For example, Defendants unilaterally altered the compensation scheme Plaintiff had agreed to—tipping the host 1.5% of their total sales in return for the host assisting with the customer experience – by cutting the host and thus depriving Plaintiff and the other servers of their ability to assist with the customer experience. Despite not having a host for significant portions of their shift, Defendants nonetheless required Plaintiff and other Tipped Employees to tip out to the host based on sales for their entire shift.

205.    Plaintiff, on behalf of herself and the members of the PA Class, are entitled to recover from Defendants the amount of tips surrendered to Defendants for hours worked when there was no host, and an additional amount of 25% of the unpaid compensation as liquidated damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, individually and/or on behalf of herself and all other similarly situated members of the Classes, respectfully requests the Court grant the following relief:

A.    Designation of this action as a collective action on behalf of the Collective Class, and prompt issuance of notice pursuant to 29 U.S.C. §216(b), apprising them of the pendency of

this action, and permitting them to assert timely FLSA claims in this action by filing individual Consents to Sue pursuant to 29 U.S.C. §216(b);

B.    Designation of the action as a class action under F.R.C.P. 23 on behalf of the PA Class;

C.    Designation of Plaintiff as representative of the Classes;

D.    Designation of Plaintiff's counsel as class counsel for the Classes;

E.    A declaratory judgment that the practices complained of herein are unlawful under the FLSA, PMWA, and WPCL;

F.    An injunction against Defendants and their officers, agents, successors, employees, representatives and any and all persons acting in concert with it, as provided by law, from engaging in each of the unlawful practices, policies and patterns set forth herein;

G.    An award of unpaid minimum wages to Plaintiff and the members of the Collective Class and PA Class;

H.    An award of liquidated damages to Plaintiff and members of the Classes;

I.    An award of costs and expenses of this action together with reasonable attorneys' and expert fees to Plaintiff and members of the Classes; and

J.    Such other and further relief as this Court deems just and proper.

## **DEMAND FOR TRIAL BY JURY**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury on all questions of fact raised by the complaint.

Dated:  February 7, 2025

Respectfully submitted,

*/s/ Gary F. Lynch*
Gary F. Lynch (PA 56887)
Stephen E. Connolly (to be admitted)
**LYNCH CARPENTER, LLP**
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
T: (412) 322-9243
gary@lcllp.com
steve@lcllp.com

***Attorneys for the Plaintiff and the Proposed Classes***